```
                                FILED
                          CLERK, U.S. DISTRICT COURT
                              JUN 25 2024
                        CENTRAL DISTRICT OF CALIFORNIA
                        BY: _____rsm_____ DEPUTY
```

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>KYROLLOS MEKAIL,<br><br>　　　　　Defendant. | CR No. 2:24-CR-00391-MCS<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 1347: Health Care Fraud; 18 U.S.C. § 982: Criminal Forfeiture] |

　　　The United States Attorney charges:

COUNTS ONE AND TWO

[18 U.S.C. §§ 1347, 2]

A.　　INTRODUCTORY ALLEGATIONS

　　　At times relevant to this Information:

　　　Defendant and Relevant Entities

　　　1.　　Defendant KYROLLOS MEKAIL owned, operated, and was the Pharmacist-in-Charge for MONTE VP LLC d/b/a Monte Vista Pharmacy ("Monte Vista"), a pharmacy located at 9635 Monte Vista Avenue, Suite 202, Montclair, California 91763, within the Central District of California.

　　　2.　　Defendant MEKAIL controlled and was a signatory for business checking accounts in the name of Monte Vista at Wells Fargo

Bank (the "Monte Vista Wells Fargo Account") and Bank of America (the "Monte Vista BofA Account," and collectively with the Monte Vista Wells Fargo Account, the "Monte Vista Bank Accounts").

3. Co-Schemer 1 was a patient marketer from Orange, California, who purported to work for Company 1.

4. Company 1 was a California company owned by Co-Schemer 1's attorney.

5. Co-Schemer 1 controlled a trust established for Co-Schemer 1's benefit ("Trust 1"). Trust 1 held accounts at Wells Fargo Bank with another individual as the signatory (collectively, the "Co-Schemer 1 Trust Accounts").

6. Co-Schemer 2 was a Nurse Practitioner who lived in West Hills, California, and had an office in Calabasas, California.

7. Co-Schemer 3 was a patient marketer from Ontario, California.

8. Company 2 and Company 3 were California limited liability companies owned by Co-Schemer 3 and her spouse.

9. Co-Schemer 4 was a Nurse Practitioner who lived in El Monte, California. Co-Schemer 4 had an office in South El Monte, California.

10. Co-Schemer 5 was a Nurse Practitioner.

<u>Medi-Cal Program</u>

11. Medicaid of California ("Medi-Cal") was a health care benefit program, affecting commerce, that provided reimbursement for medically necessary health care services for low-income individuals including families with children, seniors, persons with disabilities, individuals in foster care, pregnant women, and low-income individuals with specific diseases such as tuberculosis, breast

2

cancer, or HIV/AIDS. Funding for Medi-Cal was shared between the federal government and the State of California. Individuals who qualified for Medi-Cal benefits were referred to as "beneficiaries."

12. Health care providers, including pharmacies, could receive direct reimbursement from Medi-Cal by applying to Medi-Cal and receiving a Medi-Cal provider number. Medi-Cal reimbursed health care providers for medically necessary treatment and services rendered to Medi-Cal beneficiaries.

13. To obtain payment for services, an enrolled provider, using its unique provider number, submitted claims to Medi-Cal certifying that the information on the claim form was truthful and accurate and that the services provided were reasonable and necessary to the health of the Medi-Cal beneficiary.

14. Medi-Cal was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

15. Monte Vista was a Medi-Cal provider. Defendant MEKAIL submitted a Medi-Cal provider application for Monte Vista in or around February 2022.

Medi-Cal Program's Temporary Prior Authorization Suspension

16. Medi-Cal at times required that providers obtain "prior authorization" before providing certain health care services or medications as a condition of reimbursement to ensure the health care service or medication was medically necessary and otherwise covered.

17. As a condition of reimbursement, Medi-Cal traditionally required prior authorization for an array of medications, including medications that contained cheap, generic ingredients but were manufactured in unique dosages, combinations, or package quantities, and were not included in the applicable maximum price lists that

capped Medi-Cal reimbursements ("non-contracted, generic drugs"). However, Medi-Cal temporarily suspended prior authorization requirements for most prescription medications at the beginning of 2022 in connection with an ongoing transition of Medi-Cal's prescription drug program from managed care to fee-for-service, referred to as "Medi-Cal Rx."  In or around February 2022, Medi-Cal notified providers of the change in prior authorization requirements, which was made retroactive to in or around January 2022.

B.   THE SCHEME TO DEFRAUD

18.   Beginning in or around May 2022, and continuing through in or around March 2023, in Los Angeles County, San Bernardino County, and Orange County, within the Central District of California, and elsewhere, defendant MEKAIL, together with Co-Schemer 1, Co-Schemer 2, Co-Schemer 3, Co-Schemer 4, Co-Schemer 5, and others known and unknown to the United States Attorney, knowingly, willfully, and with intent to defraud, executed and willfully caused to be executed a scheme and artifice: (a) to defraud a health care benefit program, namely, Medi-Cal, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from a health care benefit program, namely, Medi-Cal, by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C.   MEANS TO ACCOMPLISH THE SCHEME TO DEFRAUD

19.   The fraudulent scheme operated, in substance, as follows:

   a.   Following Medi-Cal's suspension of prior authorization requirements in February 2022, Co-Schemer 1 referred prescriptions

4

for certain non-contracted, generic drugs -- including Chlorzoxazone 375 mg tablet; Crotan 10% lotion; DermacinRx Lidogel 2.8% gel; Diclofenac 2% solution pump; Fenoprofen 400 mg capsule; Folite tablet; Indocin 50 mg suppository; Lidocaine-Prilocaine 2.5%-2.5% cream; Lidocort 3%-0.5% cream; Lidotral 3.88% cream; Lofena 25 mg tablet; Meloxicam 5 mg capsule; Naftifine HCL 1% cream; Naproxen-Esomeprazole DR 375-20 mg tablet; Norgesic Forte 50-770-60 mg tablet; Omeprazole-Sodium Bicarbonate 20-1,680 packet; Oxiconazole Nitrate 1% cream; and Synoflex 4%-5% patch (collectively, the "Fraud Scheme Medications") -- to Monte Vista, so that Monte Vista could submit claims for the Fraud Scheme Medications to Medi-Cal and receive reimbursement on those claims.

    b.   Defendant MEKAIL paid and caused to be paid kickbacks to Co-Schemer 1 in exchange for the referral of patient prescriptions for the Fraud Scheme Medications for which Monte Vista could bill Medi-Cal for the purported dispensing. Defendant MEKAIL's kickback payments to Co-Schemer 1 at times equaled approximately 40 percent of Monte Vista's revenue from the fraudulent claims associated with prescriptions Co-Schemer 1 referred.

    c.   Defendant MEKAIL concealed and disguised the scheme by paying the kickbacks in the form of checks drawn on the Monte Vista Bank Accounts payable to the Co-Schemer 1 Trust Accounts, often with false check memo lines suggesting the payments were for "consulting service[s]," so as to disguise the nature, ownership, and control of the kickback payments.

    d.   Approximately 85 percent of the claims for Fraud Scheme Medications submitted by Monte Vista to Medi-Cal identified Co-Schemer 2 as the prescriber. Co-Schemer 2 worked for Company 1

and had an office in Los Angeles County.  From Co-Schemer 2's office, Co-Schemer 2 wrote, and caused to be written, prescriptions for the Fraud Scheme Medications for Medi-Cal beneficiaries whose names and personal identifying information were provided by Co-Schemer 1 in return for payments from Co-Schemer 1's attorney and others to Co-Schemer 2 for each prescription Co-Schemer 2 signed.

  e.  Co-Schemer 2 or Company 1 then submitted the prescriptions to Monte Vista so that Monte Vista could submit claims to Medi-Cal for the Fraud Scheme Medications.

  f.  Co-Schemer 3 also referred prescriptions for the Fraud Scheme Medications to Monte Vista so that Monte Vista could submit claims for the Fraud Scheme Medications to Medi-Cal and receive reimbursement on those claims.  Defendant MEKAIL knowingly and willfully paid and caused to be paid kickbacks to Co-Schemer 3 in exchange for the referral of patient prescriptions for the Fraud Scheme Medications that could be billed to Medi-Cal.

  g.  Defendant MEKAIL paid the kickbacks to Co-Schemer 3 in the form of checks drawn on the Monte Vista Bank Accounts payable to Company 2 and Company 3 and by falsely labeling many of the check memo lines as "consulting service," to disguise the nature, ownership, and control of the kickback payments.  In total, defendant paid and caused to be paid to Co-Schemer 3 approximately $5 million in kickbacks from the Monte Vista Bank Accounts to Company 2 and Company 3.

  h.  The prescriptions for the Fraud Scheme Medications provided by Co-Schemer 3 in exchange for kickbacks included prescriptions identifying the prescribers as Co-Schemer 4, who had an office in Los Angeles County, Co-Schemer 5, and others.

i.  Defendant MEKAIL submitted and caused Monte Vista to submit false and fraudulent claims to Medi-Cal for the purported dispensing of the Fraud Scheme Medications.  At the time defendant MEKAIL submitted and caused the claims to be submitted to Medi-Cal, defendant MEKAIL knew that these Fraud Scheme Medications, in many instances, were not provided to the beneficiaries because Monte Vista did not have sufficient inventory to dispense the Fraud Scheme Medications.  In doing so, defendant MEKAIL knew that these claims were false and fraudulent.

20.  From in or around May 2022 to in or around March 2023, defendant MEKAIL, along with Co-Schemer 1, Co-Schemer 2, and others known and unknown to the United States Attorney, submitted and caused to be submitted at least approximately $260,294,695.47 in false and fraudulent claims to Medi-Cal for purportedly dispensing the Fraud Scheme Medications prescribed by Co-Schemer 2, on which Medi-Cal paid at least approximately $172,851,837.02.

21.  From in or around May 2022 to in or around March 2023, defendant MEKAIL, along with Co-Schemer 3, Co-Schemer 4, Co-Schemer 5, and others known and unknown to the United States Attorney, submitted and caused to be submitted at least approximately $32,012,138.64 in false and fraudulent claims to Medi-Cal for purportedly dispensing the Fraud Scheme Medications prescribed by Co-Schemer 4, Co-Schemer 5 and others, on which Medi-Cal paid at least approximately $21,566,884.02.

22.  From in or around May 2022 to in or around March 2023, defendant MEKAIL, along with others known and unknown to the United States Attorney, submitted and caused to be submitted at least approximately $14,214,558.77 in additional false and fraudulent

7

claims to Medi-Cal for purportedly dispensing the Fraud Scheme Medications, on which Medi-Cal paid at least approximately $9,613,430.38.

23. In total, and pursuant to the fraudulent scheme, from in or around May 2022 to in or around March 2023, defendant MEKAIL, along with Co-Schemers 1 through 5, and others known and unknown to the United States Attorney, submitted and caused to be submitted at least approximately $306,521,392.88 in false and fraudulent claims to Medi-Cal for purportedly dispensing the Fraud Scheme Medications, on which Medi-Cal paid approximately $204,032,151.42. At the time defendant MEKAIL submitted and caused the claims to be submitted to Medi-Cal, he knew that these Fraud Scheme Medications were medically unnecessary, and in many instances, were not provided to the beneficiaries and that the prescriptions for the Fraud Scheme Medications were procured through kickbacks.

D. EXECUTIONS OF THE FRAUDULENT SCHEME

24. On or about the dates set for below, within the Central District of California, and elsewhere, defendant MEKAIL, together with others known and unknown to the United States Attorney, knowingly and willfully executed and willfully caused to be executed the fraudulent scheme described above by submitting and causing to be submitted the following false and fraudulent claims:

| COUNT | DATE | BENEF-ICIARY | CLAIM NO. | MEDICATION | PRESCRIBER | APPROX. BILLED AMOUNT |
|---|---|---|---|---|---|---|
| ONE | 10/11/22 | K.R. | 51250479201 | Meloxicam 5 mg capsule | Co-Schemer 2 | $13,424.45 |
| TWO | 10/13/22 | K.R. | 51374695801 | Lofena 25 mg tablet | Co-Schemer 2 | $8,371.31 |

8

FORFEITURE ALLEGATION

[18 U.S.C. § 982]

1. Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7), in the event of the defendant's conviction of the offenses set forth in any of Counts One or Two of this Information.

2. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction, including but not limited to:

(i) The real property located at 16457 Mariposa Avenue, Riverside CA, 92504, parcel number 273-580-024, where Kyrollos Mekail and Mena Mekail hold title as joint tenants, and known further by the legal description "Lot Number: 24 Tract No: 22100-3 Brief Description: 1.54 ACRES NET IN POR LOT 24 MB 240/055 TR 22100-3"; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof

(a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

KRISTEN A. WILLIAMS
Assistant United States Attorney
Chief, Major Frauds Section

ROGER A. HSIEH
Assistant United States Attorney
Deputy Chief, Major Frauds Section

GLENN S. LEON
Chief, Fraud Section
U.S. Department of Justice

NIALL M. O'DONNELL
Assistant Chief, Fraud Section
U.S. Department of Justice

SIOBHAN M. NAMAZI
Trial Attorney, Fraud Section
U.S. Department of Justice